We have two docket numbers, 21-3064 and 22-118, United States of America v. Valdez-Simmons. We have the appeal, the cross-appeal by the government here. Thank you so much. I am looking at the right case. Good morning. May it please the court, Kendra Hutchinson of Federal Defenders of New York for Valdez-Simmons in this case. I'd like to request two minutes for rebuttal, Your Honor. Yes, and I strongly suspect we will be keeping both sides up considerably past the end. Ten minutes. I'll take ten minutes for rebuttal then, please. Now, rebuttal, we're going to hold everybody to the right numbers. Commencing with the Second Amendment issue, which I think really is the forefront of this case, Mr. Simmons' conviction under 18 U.S.C. 922-G9, which prohibits gun possession for one who is only convicted of a misdemeanor of domestic violence, it violates his right to keep and bear arms under the Second Amendment. The first part of the analysis that the court must engage in here, and that the parties are really vigorously disputing, is whether or not Mr. Simmons is part of the people protected by the Second Amendment, whether he falls within the ambit of the Second Amendment. And there's really two approaches here, and I think the parties are coming at it with those two different approaches. And the Supreme Court has taught in Heller, and particularly in Heller, that the people is a term of art that has a unitary meaning. It is consistent throughout the Bill of Rights, which was ratified shortly after the Constitution, and it's essential to several states' decisions to even ratify the Constitution. In Heller, the court... Are you referring to the... 922-G1. Yes, the 922-G1, yes. Well, Your Honor, I think that case was a... If you're speaking of Range, which is a Third Circuit case, that is rehearing on bonk. It was granted, and that decision was vacated, so it's really not clear what's going on. If you're speaking about the cases that my friend, you know, presented to the court last night in a 28-J letter, that was a plain error review case. But, Your Honor, you know, this... The difference here is really gets at the heart of what the parties are arguing. The government is really relying on the law-abiding, responsible formulation of, you know, spoken of in Bruin and Heller to argue that, you know, felons, and felons and the mentally ill are not covered, in the felon and possession cases, Your Honor, are not covered by the scope of the Second Amendment's protection. This case is different. Mr. Simmons is a misdemeanant. Is he also a felon? He is, Your Honor, but this is not the conviction. This is not what the government charged him with. But he's a felon. But the government would have to... That would be a different case, and... But he is a felon. You can see that. Yes, he has a drug felony that we're contesting on our other grounds. So, I guess it does raise the question that if one accepts the premise that... either premise, that felons are excluded from the people for purposes of the Second Amendment, or that it is perfectly legitimate that felons should not be allowed to have guns, either way, doesn't that knock out Mr. Simmons? He is conceitedly a felon. It may not be that that's why he received a penalty, but if he is someone who, by definition, does not have these rights, then how is it that punishing a person who doesn't have the right is somehow a violation of his rights if we say he doesn't have the right to begin with? Your Honor, because we really have to tether this to the regulation at issue. That's what Bruin teaches. We must examine the regulation at issue. The regulation at issue here is the prohibition on him possessing a gun because he's a misdemeanant. For whatever reason, the government... That's the penalty that was applied here. But we all know... I mean, I would assume you concede that it would be illegal for him to possess a gun, right? Or do you not concede that because you think felons have a right to possess a gun under the Second Amendment? Your Honor, this is not a felon in possession case. This certainly is not. I appreciate that. And I'm asking a sort of... I hope I'm saying it right. I'm asking an antecedent question. So let's just start. We all agree that he is, in fact, a felon, correct? That's right, Your Honor. My question, then, is do you agree that as a felon, he, in fact, he, personally, does not have a right under the Second Amendment to possess a gun? We're not arguing that here, Your Honor. I know that you're not arguing that. Do you agree or disagree with that statement? We're not going to concede that here, Your Honor. Right. If the Court were to accept that Bruin and Heller's references to the long-standing prohibitions against felons possessing guns, if the Court were to accept that that somehow circumscribes the scope of whether or not this person is a part of the people and or the second part of the test, we would really argue that it is focused on the fact of whether or not the government has proven that someone is a felon. And they have not proven that in this instance for this particular prosecution. The regulation that we have at issue here is the misdemeanor issue. But it's not just a misdemeanor issue, right? It's a misdemeanor issue for domestic violence. And so, I think what you need to do at this point is go to the historical analog that suggests that persons who are violent were permitted to be armed. Is that where you're moving? Well, that's where the government... This is a very hard question, and I think us being forthright about... This is a boundary-testing question, so we need to be forthright about what it is we're doing. Let's not hide around the fact that he has a felony conviction. Let's not hide around the fact that it's a domestic violence underlying misdemeanor. Let's treat it as it's hard, because it's a hard question. Judge Perez, I really appreciate you saying that, because I did want to address that with the Court. I wanted to pause for a second and understand and note that this is a sensitive issue, one that the policy concerns behind it are salutary and admirable in their weighty. And we don't mean to demean it by bringing a challenge such as this. But we really... The Supreme Court has spoken, and even if we dislike some of the results, this is the first court to address this particular statute. We must apply faithfully the test set forth in Bruin. And in terms of the substance of your question, Your Honor, so if we parse this out as if the issue is the punishment or how society deals with domestic violence and domestic abusers, I think there is no question the government fails. They have not provided... Are we actually taking the position that the historical approach that folks have taken to women is the appropriate analog? Is that actually where you're going? Well, if we center... It's a whole parade of horribles. Us disarming people who were Catholic, us disarming people who were African-American. My understanding is that the standard is irrelevant to historical analog. And so it would be helpful for you to clarify. Yes. It's our contention that the standard here is that this is a general societal problem. We define the problem as dealing with and punishing domestic violence. This is a general societal problem that has persisted since the 18th century, and I'm quoting directly from Bruin here. And thus, the government must show distinctly similar historical regulations addressing that problem. And if the founders dealt with that problem in a materially different manner, then that would be evidence that disarmament does not have a historical tradition. In our brief, Your Honor, we noted the history of dealing with domestic violence in the United States. The outdated, appalling concept of marital chastisement, and that yes, this was dealt with by the founders and by the colonists, but it was dealt with in a very different way. It was dealt with as stockade. It was dealt with other sort of civil punishment. It was not dealt with. There's no evidence whatsoever that it was dealt with by disarming the domestic abuser. Why is it that we are focused on the notion of domestic violence and not simply violence? Now, it seems to me that, you know, the legislature could abolish the crime of assault and then create 16 small assault statutes, right? Assault in public, assault in private, assault on a family member, assault on a stranger. And they could slice and dice it, however, but you wouldn't suggest at that point that we would evaluate the statute by reference to assault on strangers and say, oh, well, everybody knew that in colonial times robbers would waylay people on the road who were strangers and beat them up. They never banned anything saying assault on strangers. They just had assault. So I guess what I'm saying here is, considering that we do know that they were perfectly willing at the time of the founding to bar people who had committed violence or who threatened, in their view, to commit violent acts from having guns, why is this not a clearly subsumed subspecies of that category? I understand exactly what your Honor is getting at, and I appreciate you posing this question because I think that is really the heart of the government's contention, that this is that one must look at this as a, you know, the only way to curb or prevent or punish violence, you know, violent individuals. And, you know, and so as a result, it is almost as if, you know, my friend is, you know, importing the entire felon-in-possession body of law, like felon-disarmament body of law into this. But I think we need to really drill down to what this misdemeanor in this case was. This was third-degree assault in New York that punishes intentional causation of physical injury, and physical injury is defined in New York as substantial impairment, substantial pain or impairment of bodily function. The case law discloses that a single blow that causes a bruise could meet this standard. So in other words, we would have to accept to say that this particular offense at issue here equals the dangerousness or the violence that the founder is meant to prevent or to punish or to disarm. What is the definition of assault under the common law? Intentionally causing injury. Is it? It has to cause injury? I thought it could just be an offensive touching. Well, and actually this gets to another point here. So the Supreme Court has defined here, yes, and Castleman and Boissin has addressed the G-9 several times and read it very broadly to include the mens rea of recklessness and a sense of touching. Yes, Your Honor, I apologize. So I guess my question is if we look at that and we say to the common law of assault and battery, things that I think we would all agree way back to the time of founding were the kinds of penalties that were viewed as things that could be subject or could yield a penalty or regulation of use of possession or use of firearms, then because this is not a conviction for any crime involving domestic relations, right? It doesn't say something like failure to pay alimony or something like that. But very specifically, it's a subspecies of violence. Why is that, again, I'll just come back to that, why is that somehow broader than the sort of thing that was regulated at the time of the founding? Because the violence that is an issue in this particular case is as easy, is as simple as a reckless, offensive touching. There is no hint whatsoever that the founders would have disarmed a person who recklessly, offensively touched someone and prevented them from, for the rest of their life, from having a weapon. Your Honor, so— So is it Israel that you think separates this? Yes, and the actual violence— The offensive touching is covered, right? Pardon me, Your Honor? The offensive touching would certainly be covered. Under this? Under the definition that is about by the Supreme Court? No, the actus reus. Yes. Do you agree that an offensive touching would have been perfectly a basis for stripping somebody of their rights to have a firearm? It seems to me that you're distinguishing the mens rea that attaches to that. Your Honor, I don't think I am agreeing that an offensive touching would be sufficient to strip someone of their firearm. And I don't think the government has historical evidence that suggests it is. The, you know, the felonies at common law around the time of the founding were, you know, murder, mayhem, kidnapping, rape, etc. Assault was part of the etc. Yes, but— And I don't think assault requires bashing somebody's head in. Yes, but the government has— And also, it can taper off to the slightest bit of an offensive touching, right? Your Honor— Let's just stay with that. Yes or no? Under the definition, yes, Your Honor. But the problem is that the government has not proffered the historical precedent for this. It is their burden to do so, and they haven't. I would like to select which part of that. I guess the actus reus is opposed to the mens rea. And I understand your argument that you're saying, I think, you're saying that recklessness at the time would not have been a sufficient mens rea. I'm asking now, splitting this a little bit. It seems to me that we're all in agreement that the actus reus would certainly have been the kind of actus reus on which their founders would have been perfectly— They wouldn't have seen that restricting someone's ability to have a firearm based on this actus reus was a problem. I understand you're saying, yes, but at the time, the actus reus would have had to be married with a certain mens rea that is different and more stringent than the mens rea attached to the domestic violence. Am I characterizing your argument properly or not? I don't want to pervert you. Yes, Your Honor. Yes, I certainly agree with the mens rea aspect of your argument. I don't think the government has proffered sufficient evidence for me to be able to concede to you right now that our argument is that an assault would be sufficient to warrant disarming somebody permanently for the rest of their life. One of the things that I'm struck by is the absence of an appropriate historical twin. It seems to me that you're suggesting the closest twin is the way you treated domestic violence perpetrators. I'm wondering instead if there are other twins like the way people treated folks who were perceived as dangerous without the basis of anything. There's a ton of historical record about indentured servants being prohibited from owning, persons, African American persons, Native Americans, and so it's not a, can you explain why a better twin might instead be persons who were perceived to be dangerous? Yes, Your Honor is referring to the historical references, historical sources suggesting that that, you know, ones who are perceived to be dangerous to the authority in many ways, right, and I think it's something, you know, many of those categories are categories that we find odious now. And that might mean very well that under modern standards they would fall perhaps under equal protection or other statutes, but that would not suggest that they were outside the scope of the Second Amendment's prescription. I think that's probably right. I think that other amendments would not allow such, you know, odious or abhorrent... Part of the reason I'm struggling with is on one hand there's a recognition that some of our history is something that is not something we would tolerate, and other parts of our history like the way the way that women were allowed to be treated in marriage is tolerable, and so I'm having a hard time squaring that, but I'm also asking what I think is a doctrinal question, which is one way to harmonize this history, the idea of people who were perceived to be dangerous, even if there wasn't affirmative evidence of it in the particular, because certainly there was no evidence that all all clickers were dangerous or all indentured servants were dangerous. How do we deal with the perception of danger, and why is that not an appropriate analog, and then if you can explain to me why we can recognize and accept that some of our historical analogs don't apply now, because we've moved beyond that, but not this one. I think just to really quickly address what you said at the end, I think courts across the land are struggling with the last question, Your Honor, about how do we recognize historical analogs that sometimes don't make sense. In terms of the perception of dangerousness, I think it seems to me that if we look to Bruin and Heller and if we accept the government's contention that there are some people, that some conduct, that disarmament is appropriate in some instances, I think Bruin and Heller really doesn't come down to, doesn't allow it for anything except for one who is convicted, or one who is mentally ill at this point. I don't think that the law has moved far enough in order that we can bless these status-based dangerousness, perception of dangerousness. I guess I'm curious though, I mean, if what you're saying is the Supreme Court has not yet confronted that precise question and issued a holding, then yes, I get it. We have a handful of cases from the Supreme Court. That's why we're deciding this case and not just issuing a summary order based on whatever the Supreme Court said on the point. But if maybe one way, I don't know if this is a rephrasing of Judge Pettis' question, but if we're trying under Bruin to determine what is the appropriate level of generality at which to describe the historical practice in the United States of when a right to possess, carry a firearm can be limited in the Second Amendment, are we in effect trying to look at the various practices at the time to discern what is the common thread? And when we determine that common thread, we now know that is the level of generality at which we operate. And if we have various things saying, okay, if you committed murder, that's fine. You can't have a gun. But there's also ample number of instances where there's the perception of dangerousness. Is that, in fact, the common thread? And therefore, the appropriate level of generality at which we should then evaluate what's going on here. Because obviously we can extract late up, we can extract or reduce down. But if we're trying to find the common thread, if that, by looking at our historical antecedents, finding the common thread, does that then give us the level of generality at which we operate? Right. I don't think that in this case, Your Honor, perceptions of dangerousness is the appropriate lens through which to look at this particular case. I can understand that the Court is reluctant to just pull this out all the way up to the level of how one deals with domestic abusers. But if we go to the next level below, what we have is a misdemeanant. So someone who has committed a crime, I think that would be the next appropriate level. But this isn't drawn for misdemeanors. This is drawn for violent misdemeanors, right? I mean, this isn't for spitting on the sidewalk. This isn't for jaywalking, you know, stealing $300, shoplifting or something. This is for violent misdemeanors. That's right, Your Honor. So I guess, why are we not operating at the level of generality? It seems to me that misdemeanors, that's a level of generality beyond what I think we have been presented with historical evidence regarding. But we have been given historical evidence that violent people, people who have been adjudicated to be violent, sort of form a subgroup of that, and that people perceived to be violent is a bigger group. And there seems to be evidence that people who are perceived to be potentially violent could be, have their rights to firearms regulated. But we're within a tighter group of those who have been adjudicated to have committed acts of violence. And here, of course, we have the particulars of this case where you beat somebody up. How is he not within the core of that group of people who have not just perceived to be violent, but are actually violent? Your Honor, because the historical antecedents that the government relies upon, and that all the courts and this Court are grappling with, there's a finite number of them, they really do apply to a level of violence or harm or, in essence, felon-level violence that is not present in this case, notwithstanding the facts of this case, Your Honor. You know, Mr. Simmons... I'll just go back. Maybe I'm going back. I don't want to repeat myself, but I guess I will. The Actus Reis versus mens rea, I thought we had already determined that there were plenty of assaults and batteries that would have been perfectly subject to firearm restrictions as founding for something that could be as light in Actus Reis as offensive touching. I mean, I don't think that they were stratifying the assaults into super bad assaults or aggravated assaults that caused serious bodily injury as opposed to mere assaults. All the assaults would have been covered. So I guess I'm wondering why it is that injury to the misdemeanor is bad. I think the only thing I've heard so far is that it could be attached to a recklessness mens rea. So I guess my question is, if you're looking at dangerousness based on violence, why are we focused on the mens rea as opposed to the Actus Reis? If the Actus Reis is just as bad as anything that would have been happening at the founding, it would have been subject to regulation. And the only distinction is the mens rea. Why, if that is different, if there weren't regulated recklessness at the time, why is that material? Your Honor, I just, I want to, I know that we are dealing with the level of generality that the government is propounding, but I just, I want to back up for a second and state that the government is trying to have this in some ways, trying to have it both ways. On the one hand, they're saying that this is closing a dangerous loophole, so they're acknowledging that this is, you know, that the purpose of this in particular is really that the Congressional intent behind it is to prevent and stop domestic violence. And so, you know, while we are... To prevent deaths, right? Because one of the key indicators of lethality in is possession of a weapon. Yes, and I understand that, Your Honor, and that was a part of the Congressional record, and this is a sensitive topic in this case, Your Honor, but, you know, it's our contention here that you know, if we're looking at the Congressional purpose behind these amendments, the Lawtenberg amendments, which are only, you know, 30 years old at this point, the purpose of these was to remedy domestic violence, and so that that is the appropriate place where we should be focused here, because it's the how and the why, right? From Bruin, it is the how and the why, and Bruin, and the why here is to remedy domestic violence, and so as a result... It just occurs to me, I'm not sure... Is there a necessary implication of your position if we were to agree with you, that on supervised release, if your client were convicted of, let's say, some sort of federal misdemeanor of domestic violence, assuming such a thing exists, I can't remember if it does, maybe it would under the assimilated crimes act or something, you'd do it on a federal base or something, that it would therefore be a violation of the Second Amendment to have as a condition of supervised release, he thou shalt not possess a firearm? Well, that's not here, Your Honor, although... Although, you know, inquiring minds want to know, but... Wouldn't that be the implication? What's the difference, right, between a court saying thou shalt not and the I think... Look, that is not this case here, Your Honor, perhaps you'll see that in a couple of years. Isn't the point of the legislation, having had a background in the state court system, when you're convicted of a misdemeanor in a state court, any court, I believe, in the United States, there is a registry, there is a notice that's given to the federal government that this person has been convicted of a domestic violence misdemeanor offense under VAWA, which makes them not eligible to possess a gun. Makes them not law-abiding, correct? So, this isn't a hypothetical in your client's situation. This is very real. If he's been convicted of a domestic violence misdemeanor offense in a state court system, he is forever ineligible to possess a weapon. He's noted, presumably, notified of that, should be notified of that. There's a form that's handed out that the defendants receive. The court has to give notice on the record, and that person is on a registry, unable to possess a weapon. So it is not, Judge Nardini's question is not so speculative, is it, in your client's case? Yeah, I actually come from state practice as well, Your Honor. It is my understanding that, yes, that this particular misdemeanor conviction, because it involves an intimate partner, would put him on this, you know, under the law and But that is not I also just want to note that under, I believe it's 921, there are ways to if one has a misdemeanor crime of domestic violence, after five years, one can actually come off of that and regain and not be considered criminal. Well, they have to show that they engaged in treatment, that they have been rehabilitated, that they have completed domestic violence, intensive domestic violence treatment, correct? And they've not reoffended. Right. But, you know, this is not a case, and I appreciate Your Honor's point, but this is not a case in which you know, you know, Mr. Simmons is it's not a civil case in which he's coming and he's suing to get his gun back, even though he's been prohibited from I'm sorry, doesn't Judge Kahn's observation reinforce the conclusion that the structure of 921, 922G is very much focused on violence, the threat of violence that, you know, the principle is that, well, you have to have a misdemeanor conviction for a crime of domestic violence to be excluded and to be penalized for possessing a gun. One of the ways to get it back, to get back that right, arguably, is to engage in these various forms of treatment that are clearly designed to ameliorate the danger that a person might pose. Doesn't that sort of reinforce the notion that what is animating this whole scheme is an evaluation or an assessment of the likelihood that this person is going to engage in violent behavior, and doesn't that take us back to what has been done since the founding, which is to regulate the possession of guns by adjudicated violent people? Well, you know, again, I will stick to our position on this, which is that this enactment, although, you know, obviously it is designed to prevent violence, but in particular, it is designed, as the government repeatedly insists, it is to close the loophole for domestic violence, right? This is not just to prevent violence in general on the street, as Your Honor was saying before, stranger violence or anything like that. This is animated by an intent by Congress to remedy domestic violence, and as a result of that, that is the antecedent, those are the historical antecedents that we must look to in this instance. And it's domestic violence not only to the alleged victim, but also to law enforcement when they're responding to domestic violence calls, because they tend to be the most dangerous. It's also an indication of potential lethality to other members, family members, friends of the target. So we're not talking about violence just to the original victim or alleged victim of the domestic violence. Right, and I think Your Honor, actually, your point is well taken here, because what this does is this really is an entire amendment that changed many areas of the law in order to remedy domestic violence concerns. This is not just to prevent violent people on the street. And for that reason, we think that the government has failed to meet their burden to prove distinctly similar regulations. Thank you, Your Honor. Thank you very much. We have considerably passed your time, but you still have a couple minutes left. Mr. Shin for the government, we'll hear from you. Thank you, Your Honor. I'm wondering if in light of our cross-appeal, I could request that the government reserve two minutes of rebuttal time as well? No, we're just going to be straight through. Anything you have to say. We have plenty of time here. Just cover what you need to cover. Counsel for the appellant is only going to get two minutes at the end, so there won't be much that you need to clean up after that two minutes. Fair enough, fair enough. I'd like to start by reminding the court of the applicable standard of review in this case with respect to the Second Amendment claim. Because it was not preserved below, the claim is reviewed for plain error. And as this court's case is made clear, that means that under the second prong of the plain error test, the error has to be clear or obvious. And so we have a situation here where there's no binding precedent from the Supreme Court or from this court declaring 922 G9 unconstitutional under the Second Amendment before or after Bruin. So you're suggesting that under cases like the Plob, where we said that if you don't have binding precedent for the Supreme Court or our court, you'd be extraordinarily hard-pressed to say that any error, hypothetical or otherwise, is going to be plain, and that would be an independently sufficient ground for us to rule in your favor on the second prong of plain error? That's right, Your Honor. And so, it's particularly so here where not only is there an absence of controlling precedent going the defendant's way on this claim, every court that has addressed this claim since Bruin has rejected it, in fact. Granted, those are all district court decisions, but at the very least, it supports the point that the law is not clearly and obviously in the defendant's favor. And so, one way that this court could straightforwardly resolve this appeal is to affirm on plain error grounds. And in fact, that's what other circuits have done with some regularity on unpreserved Bruin-based claims, including a couple of cases that I cited in our 28-J letter of yesterday. There's a published Eighth Circuit decision affirming on plain error grounds a challenge to certain guidelines enhancement provisions, and that decision itself cites other cases that have gone off on similar grounds. So... Well, we definitely have discretion. My understanding is that we have proceeded under the four prongs of Milano. Sometimes we do it sequentially to figure out, A, whether there's error. If we would agree with the government, that we would agree with the appellant, we would then proceed to the plaintiffs, and then... So we can move through them seriatim, or we can jump to one if we think one particular is dispositive. And that seems to be something the Supreme Court and we have done with some regularity, is choosing between those two procedural itinerary frames. Right. There's no prescribed order of operations in terms of the different prongs of the plain error test. The court has discretion, and as Your Honor notes, sometimes the court addresses prong one and then goes on to prong two, but of course there are many decisions that skip over prong one and simply affirm on prong two. And in addition to the points I've made about the state of the case law, I would point out that to the extent that the panel views these questions as being hard, as Your Honor noted earlier, I think that would actually also support affirming on the second prong here. So if it's not only an open question in light of the absence of prevailing case law, but it's one in which the particular questions are novel, because obviously there are very few cases from the Supreme Court in this area, it's one that requires determining a lot of a number of predicate questions along the way, that might further counsel in favor of affirming on prong two. Can I ask you a completely different question? Of course. This answer may not appear in the record, and Counselor Day-Cohen can answer this in rebuttal as well. Is there a reason why the defendant was not prosecuted under 922 Key 1? I mean, my understanding is it's a felony, and it's sort of interesting that somebody with a felony conviction was actually charged under the relatively less invoked provision for misdemeanors of domestic violence. If this does not appear in the record, that's fine. That can be the answer. I am just curious if there is an answer. It's not in the record, although I can I'm happy to represent to the court my understanding of what happened here. So there was a conviction that was set aside as a YO, and so a full offender adjudication. Correct, Your Honor. I'm not sure that we were even aware of that, but in any event, that would have been an obstacle to relying on that conviction. And then the adult felony conviction here, remember this was charged in the wake of Rafe, and so there was some concern about whether he had the awareness that he was convicted of a crime punishable What was his sentence on that felony? Six months. I see. So he could have arguably interjected and said, I've been convicted so many times of so many crimes, I can't keep straight which were felonies and which were misdemeanors. I didn't get more than a year, and who's to say I understood that it wasn't a misdemeanor. Got it. Sorry, it was a little side inquiry I had, just more of a matter of curiosity. Right. And my co-counsel has corrected me. On the conviction that occurred when he was 16 years old, it was not set aside as a while, but it wouldn't have shown up on the rap sheet because it was a sealed conviction. That's fine. Okay. I'm sorry to have distracted you. No, no. It was something lingering in my mind as a question. Right. So, moving on from the plain error argument, which again, gives the court a way to resolve this case and leave for a future case, the resolution of the novel and potentially difficult questions here. If the court were inclined to address prong one, there are a number of ways in which the court could reject the Second Amendment claim here. First, there's the question of whether the Second Amendment applies in this situation. And that, I think, is one of the most important questions in this case. The second question is whether there's repeated admonitions in Heller and in Bruin that the right is one that's possessed by law-abiding, responsible citizens. And that's an initial textual inquiry. Now, we know that this is not the first Second Amendment case that's before us. And my, I was hoping you would address how much we as a panel would be bound by an earlier in time panel deciding whether or not people with convictions in their past were even within the scope of protection. Like, would this be something that, would that question that you just raised be something for this panel to decide or would we be bound by someone else looking at it in a different context? Like, for example, someone who has, who's possessing a firearm if they have a conviction in it. Right. So, there are pending 922G1 appeals before the court. Our office has one that's raised in the context of a civil case rather than a prosecution. That's the Zirka case. And so there, we've also made the arguments both with respect to the text of the Second Amendment and with the historical analogs. And so, this may not be a satisfying answer, but I think the answer is it depends. So, it would depend on what the panel might say in that case. And so, the panel could say if it relied on the, if it addressed the textual argument raised by the government in that case, the court could, that panel could write something that would affect this panel's analysis here. Although, they're not exactly the same question, but I would acknowledge that our argument here about whether the text applies here certainly builds off of the argument that's made in the G1 context. And the case, I'm sorry, the case you cited that is pending that you're aware of this. It's a case called Zirka. Thank you. But, to be clear, I mean, I've only had a few of these cases, but the government seems to be taking the consistent position that if you have a past felony conviction, you are, because of the language that you that you are outside the scope of the protections, which the panel may or may not reject. But, so, as of now, you're not prepared to tell me how a ruling in another case might affect at least that first level inquiry. I'm happy to go through the possible scenarios. No, I think there's a way in which the court, obviously, it could depending on how broadly it wrote its decision. So, for example, if the court accepted our argument in Zirka regarding the text of the Second Amendment, it could write a broad opinion that says that because of the language of law-abiding responsible citizens and the other arguments made in support of that argument, those with criminal convictions are outside the protections of the Second Amendment. Now, that, if that were the rationale of that case, I think that would directly apply here. On the other hand, if the court moved to a second step that said, you know, okay, they're within the scope of protections, but was there some sort of historical analog allowing this particular subset to be disarmed, right? Because that seems to me to be obvious that if, depending on what our panel does, there might be room for different sort of analysis. But the first step, the panel says that folks with criminal convictions in their past are not even within the scope of protection. That might answer. Right. So, if that decision was announced broadly to adopt that proposition, that would likely cover this case. But that panel could also accept our position on the text, but with more narrow reasoning, right? So, if that panel said, convicted felons are not covered by the Second Amendment, then this panel would still have room to get from that conclusion to this case where the defendant is not where his conviction is not based on a felony, but is based on a misdemeanor crime of domestic violence. If law-abiding is defined by somebody who has a criminal history beyond a felony that includes a misdemeanor for which they are no longer eligible to possess a weapon unless they seek some administrative proceeding that allows them, wouldn't they be similarly situated to someone who is a felon who is not eligible to possess a weapon? Yes, Your Honor, and that's part of the basis of our argument here regarding the text. So, we're not relying simply on the fact that the Court repeatedly uses the phrase law-abiding citizen, law-abiding responsible citizen. It's not that alone. If we actually look at the reasoning in Heller and Bruin, it further supports our point. So, in Bruin, as Your Honor was alluding to, the Court, in approving of shall issue licensing schemes, specifically approved of the fact that those schemes impose requirements, including background checks, that are designed to ensure that only law-abiding responsible citizens possess firearms. And, the scheme at issue in that case, the New York law, as indicated here, includes a background check to look for not only felons, but also what's defined under New York law as a serious offense. And serious offense has a number of sub-definitions, but one of them actually includes a provision that pretty closely tracks the federal misdemeanor of crime of violence, crime of domestic violence definition regarding members of one's family, etc. That background check also looks for whether possession is prohibited under federal law under 922G. There's a specific cross-reference to 922G in that prohibition. And so, that scheme, which was part of the very scheme that was before the Supreme Court in Bruin, it's designed to ensure that law-abiding responsible citizens are the population that possess firearms. And so that reasoning further supports our point. And Heller itself also supports our textual point here. So, Heller includes what is a very widely quoted, of course, discussion of the limitation of the Second Amendment right. And this comes after its discussion about how the right protected by the Second Amendment is a pre-existing right inherited from the common law. And in discussing those limitations, it goes through a number of examples. But those examples map very closely to the Second Amendment. So, it talks about nothing cast doubt on prohibitions on possession by felons and the mentally ill. That maps onto which individuals in our society are part of the people to which the Second Amendment refers. Heller goes on to talk about nothing casting doubt on prohibitions on carrying firearms in sensitive places and laws imposing conditions and qualifications on the commercial sale of arms. Those regulations map onto what it means to keep and bear arms. So, that component of the text. And then the next limitation that Heller discusses is what weapons are protected by the Second Amendment and that it's limited to those weapons that are in common use at the time. That maps onto what are arms under the Second Amendment. And so in that discussion, importantly, Heller is endorsing this reasoning that part of the textual test in terms of the coverage of the Second Amendment includes who is within this right of the people. And there it listed felons and the mentally ill, but it made clear that those prohibitions are simply examples and are not exhaustive. And so that further supports our point here that by being convicted of a misdemeanor crime of violence, a crime of domestic violence, the defendant is not protected by the right of the people under the Second Amendment. Can I ask you, in your view, and I don't think this was argued really by either side, but I addressed it for a bit with your opposing counsel. To what extent is it relevant that the defendant here is in fact a felon and that's undisputed? And I mean that in the sense of is there a background principle where you would suggest that because he's a felon and because that so clearly falls within the language of Heller as saying, you know, basically looking at the historical antecedents, felons fall outside the realm of the people to whom this particular right is guaranteed. And I don't know if it becomes a question of a definition with the people or not with the people, but a definitional reading of the text or if it's a question of standing or something that, you know, is he in a position to then challenge as a person who as a felon doesn't have this, who has forfeited his Second Amendment right, to now go ahead and challenge additional strictures such as, oh, and by the way, because you're a misdemeanor, you have committed misdemeanor domestic violence, you're going to get punished for this, that he has, he's sort of given up the right, he particularly, to complain about these, I'll call them, you know, additional layers of strictures upon him when if one proceeds from the premise that 922 G1 would be valid or not, I mean, I guess you can take 922 G1 out of it, but if you just take from the premise in Heller that a felon has given up his rights because it only is a right that's given the law by its citizens and at a minimum what that's going to mean is people convicted of felonies that this whole argument sort of goes, on his part, just goes poof. You know, why are we arguing about whether he has this, this is constraining his right when we should be proceeding from the premise that he doesn't have a right to begin with because he's a felon? So of all the people to complain about this, he's not one of them. Do you know what I mean? I understand, I understand the point, Your Honor. Yes, this is an interesting confluence here where his claimed right to bear arms is, there's an independent, an independent basis on which to conclude that he's not protected by the right of the people in the Second Amendment and that is his felon conviction here. In terms of whether that's a standing issue, I think that's, it's an interesting question because certainly that's an independent basis on which he doesn't have the Second Amendment right. There is also New York State law which independently is barring him from possessing a firearm, at least lawfully so. I'm not sure I'd be prepared to say he doesn't have standing to make the claim given that the criminal penalty that's imposed here is based on G9 and therefore is based on his conviction for a misdemeanor crime of domestic violence, but I think it's certainly supports the conclusion here at a minimum that he's not protected by the right of the people under the Second Amendment given that he has been convicted of both a felony and a misdemeanor crime of domestic violence. He is also independently not eligible to possess a weapon because he pled guilty on December 21st, 15th, 2021. He pled guilty to a misdemeanor crime of domestic violence, which under federal law would preclude him from possessing a weapon. I would agree with that, Your Honor. I think this also raises the question of as-applied versus facial challenges which I would confess that this Court applies sometimes in the context of the Second Amendment, but not uniformly. For example, in Bogle, the as-applied challenge to G1 is constitutional under the Second Amendment and did not suggest that it's amenable to as-applied challenges. Now, obviously there's an as-applied challenge currently pending in the Zirka case to G1 in light of Bruin. One of the positions we've taken in that case is that Bogle resolves that case because Bogle's reasoning wasn't disturbed at all by the Bruin decision because this Court didn't rely on means and testing in Bogle. However, in other decisions, this Court has specified facial versus as-applied challenges and the rule that can be gleaned from those cases is that so long as there's one lawful application, of course, then the facial challenge fails and obviously if the particular law challenged may be constitutionally imposed on the defendant him or herself in that case, then the as-applied challenge and the facial challenge both fail. I think here, depending on how precisely the defendant frames it, defendants, I think, aren't always precise in how they're framing Bruin challenges. Here, it would fail both facially and as-applied because it would be lawfully applied to the defendant in this case. Both for the reason that Your Honor pointed out in terms of his felon conviction which independently places him outside the protection of the Second Amendment and because the misdemeanor crime of domestic violence is also a basis to take him outside the protections of the Second Amendment for the reasons that we've been talking about and elaborated in our brief. Can I ask that we switch gears. I'm interested in hearing your reaction or your thoughts on let's say that someone disagrees with you and that we do not conclude or we conclude that persons with convictions in their past are part of the people. I believe the government thinks that doesn't end the inquiry. The next question would be to figure out could it be regulated by the government. If we're in that stage I seem to my own look at the historical record suggest that there were at least three groups that some of the evidence looked at. One was people who were perceived to be violent and in that group we tend to categorize folks that we would find abhorrent because they were just based on prejudice and things like that. But it was a perception that wasn't actually evidence. People that were actually violent and then folks that were, I guess I would call them anti-statist or anti-government or a threat to the functioning of a healthy government. Where do you think domestic abusers would fall under each of those buckets? Or is there another bucket that's a better historical analog than the one that I'm identifying? No, Your Honor. I think those are certainly part of the historical tradition that the government believes supports the constitutionality of 922 G9. Respectfully, I would frame it a little differently than the way Your Honor put it. I don't think the court is necessarily looking at each subcategory of laws that exist at the time and making that direct comparison and seeing how close that is and whether it's an historical twin, as Your Honor alluded to earlier. I think what the court can glean from actually a number of different areas of common law and colonial regulation is that there's an overarching recognition that legislatures may properly regulate and even prohibit the possession of firearms based on legislative judgments about whether particular groups of people are and you can pick a different word. You can call it dangerous or threats to society or otherwise cannot be treated as trusted members of the community. It's been phrased different ways in some of the different cases, but I think a number of different categories that Your Honor is describing fit within that particular framework. I would also put in there laws that prohibited convicted criminals, including felons, that prohibited them from possessing firearms. I think that comfortably fits within that same category. And we've cited the laws that Your Honor is describing. So there are certainly some laws that specifically address violence in particular and we've talked about, for example, the Militia Act, right, in which people could be disarmed if they were judged dangerous to the peace of the kingdom. There were also acts that Bruin itself discusses, colonial and state laws that prohibited bearing arms in a way that spread fear or terror among the people. But there are certainly other types of laws, as Your Honor has described. So there are laws that prohibited Catholics, Native Americans, slaves, Quakers, others who refused to take loyalty oaths, aliens. So these various categories of people were deemed by under the common law and under the colonial laws and some early state laws as being beyond the protections of the Second Amendment or, put another way, it was permissible to prohibit their possession of firearms. And various rationales were given. They were perceived to be dangerous, they were perceived to be disloyal and therefore a threat to the community. Just to be clear, and I think I understand what you're saying, you're certainly not suggesting that any of those regulations would necessarily be valid today given equal protection rights, and some of these were quite invidious forms of discrimination, but I understand your point is that, stripped of that, if you don't have invidious discrimination, to the extent that those reflect on the original understanding of the Second Amendment, there was a perception on the part of the legislature that they did have the right under the common law to regulate people perceived to be dangerous or, in the various formulations you put forward. But again, I don't understand the government to be suggesting that any of those forms of invidious discrimination would ever be tolerated for the many other reasons we have today, not least of which is equal protection rights. Of course, Your Honor. Absolutely. We made that clear in our brief, and I'm glad Your Honor has given me the opportunity to make that clear now. Many of these provisions would be unconstitutional under the Equal Protection Clause or the federal component under the Due Process Clause, under the First Amendment, and I was about to say unfortunately, but I'll just say it is the inquiry that the Supreme Court has commanded courts and litigants to take, which is because the Second Amendment protects a pre-existing right that's the way it was phrased in Eller, a pre-existing right that was inherited from our, I believe they put it, our English ancestors. Because it's a pre-existing right, it's necessary for litigants and the court to look at what was and as Your Honor notes and as we note, many of the laws that were permitted at the time would be viewed today as being not only abhorrent, but also unconstitutional under other provisions. And is there a reverse truth, like including the laws that allowed men to keep their wives and only get put in stockades? I mean, it seems to me that if we are acknowledging that our society has evolved such that some historical analogues need to be tweaked, is the history suggesting the attitudes that folks had toward women when you were married also limited in terms of how we can rely on them. So, if I understand Your Honor's suggestion, it's directed to the notion that it was viewed as less of a problem back at the time of the colonial era? Folks who, domestic abusers, were not disarmed is similarly limited in terms of its historical in the sort of historical applicability. Right. So, I would say, Your Honor, that there you can find guidance in Bruin's discussion of analogical reasoning and conducting the historical analog inquiry. So, it repeatedly said, you don't need an historical twin. You just need an historical analog. And it doesn't have to be a dead ringer. And it simply has to be analogous enough. That's the phrase that the Court used. And the Court also made clear that So, I think your position then is that it's analogous enough to see how the state treated the armament rights of folks who were dangerous as opposed to how the state treated men who abused their wives. Correct, Your Honor. So, the relevant inquiry would be how the legislatures were permitted and it was essentially uncontested that the legislatures were permitted to disarm entire groups of people based on these sorts of legislative judgments about their trustworthiness, whether they were threats to the community. And so, the fact that legislatures had that authority at the time of the Second Amendment, the Court can now take that authority, the fact that those sorts of regulations and prohibitions were permissible and apply them to modern problems. And Congress is permitted to make policy choices about what it views as persons who should not possess firearms. The Court's discussion, I think, of sensitive places is instructive on this. So, the Court said at the time of the founding it was clear that it was permissible to prohibit the carrying of firearms in sensitive places, places like courthouses, polling places, legislative assemblies, and it was also essentially undisputed. This is not a disputed point. But applying that permissible zone of regulation today allows modern legislatures, including Congress, to regulate and prohibit the carrying of firearms to other sensitive places. We're not limited to what those places were at the time of the founding. So, similarly here, in this context, given the authority that legislatures had at the time, and given that it was essentially undisputed that they had that broad authority, it's permissible for Congress today, or in 1996 at the time that it enacted G-9, it's permissible for Congress to make legislative judgments about who should not possess a firearm because they're dangerous. And in particular here, G-9, as Your Honor noted during the earlier discussion, it is a comparatively narrow prohibition. It applies only to those who meet the definition of, who have committed a crime that meets the definition of a misdemeanor crime of domestic violence. It doesn't apply to non-violent misdemeanors. And we wouldn't, and therefore there's no need for the court to address whether various other hypothetical misdemeanors might apply because misdemeanor crime of domestic violence is defined so narrowly. Can I just ask, I know we've kept you up for quite a long time. I know you wanted to take a little time to talk about your process deal. So if you want to do that now, I mean if you have some last, one last point to make on the Second Amendment, that's fine, but I would like to take a, if you want to take any time on the process deal, that'd be fine and we'll allow opposing counsel to have any time to respond to that. Just to close the point on the Second Amendment, I would just note that, again, if the court gets to the second, pass the text to the historical analog inquiry, that the test that Bruin articulates is is the modern regulation or prohibition, does it impose a comparable burden? And is it comparably justified? And on those points, although I don't think this overall question is an easy one, I think on that analysis, it's relatively straightforward. So the burden compared to the types of prohibitions we've been talking about from the colonial era, it's comparable in the sense that it's a complete prohibition rather than a time, manner, place type of regulation. But in some ways it's less burdensome than those 922G9 and 921, which incorporates, it requires that in order for this prohibition to apply, certain due process rights have to be afforded the defendant in connection with that misdemeanor conviction. And in addition, 921 833 explicitly gives defendants the opportunity to have the prohibition removed in the event that their state law conviction is pardoned or expunged or their rights are restored. And then turning to the comparable justification point, I think one could view 922G9 as comparably justified in the sense that it's motivated by many of the same concerns that arose at the time of the founding regarding a generalized notion of dangerousness of certain categories of individuals. But of course in many ways it is much more soundly justified than how we would view those prior colonial era prohibitions. So Congress, they engaged in fact finding and they made findings regarding the need for this prohibition in light of the special dangers that arise when someone who engages in domestic violence has a gun, including of course statistics that showed this was cited in Kauffman that an abused woman was six times more likely than other abused, to be killed if there was a firearm in the home compared to other abused women. And in light of that sort of fact gathering and fact finding that Congress engaged in, I think the court can comfortably say at a minimum that it's justified. So briefly on the controlled substance offense point, I'll note at the outset there are other pending appeals that are also considering this cocaine isomer issue. We've noted them in our brief at page 42 in note 19. And so I won't dwell on this very long, but in the event that somehow the prior panels don't resolve those issues when it comes to this panel. I would urge the court to remember that ultimately even though this is a categorical approach question, and I know that courts often rightly complain about how the categorical approach leads to perverse results. I would urge this court to not to throw up its hands in despair, but all we're asking the court to do is simply is engage in ordinary statutory interpretation. Apply the ordinary tools of statutory interpretation. And here we have a statute, the New York statute, where the terms isomer and chemically equivalent or identical, those terms are not defined. And context and history, again, ordinary tools of statutory interpretation, they give us indications that those terms don't encompass constitutional isomers. And I'm going to ask the same question. Is there any hypothetical that you can imagine other than them not reaching the issue that would cause these facts or this situation to be different or not answered by a prior panel? Well, I would say that in I think it is possible because one of the cases is pending on plain error review, so it's possible that it goes off on plain error grounds. There is one of the cases is an ACCA case in which there's a timing issue that's also relevant in that case, and in that case, that issue is also recently granted by the Supreme Court. They granted a cert petition on that. And so, again, I can't speak for the interworking... There are at least a couple of things that might require a new inquiry on the part of this panel. I think it's theoretically possible, which is why I'm addressing it. And just to complete the point on that statutory interpretation, the history leading up to the isomer provision in the state statute, it was in response to a specific problem that the legislature was addressing and that the isomer defense in state drug cases, and it was understood that that meant eight isomers. And so what you have here is at a minimum, there are reasons to view those terms in the statute as ambiguous. We think they actually support our reading, and the court could go all the way there. But at a minimum, the court could say there are reasons here to believe it's ambiguous, and therefore, you get to the realistic probability test. And on that point, there's never been any dispute that a New York court about whether a New York court has actually applied this statute in the way that the defendants have theorized. No New York court has. And I close on this point just to note, it's particularly odd, I would say, that to have federal courts interpret a state law provision expansively in a way that New York courts haven't done, and it's done in part in some cases in the name of avoiding lenity concerns, in terms of potentially increasing a defendant's sentence in the federal case. But it's done in a way that results in a New York state statute being interpreted incredibly broadly. Wouldn't you say the opposite could be true, too, that we would be saying, oh, by the way, New York prosecutors, let me tell you some cases you can't bring. And they say, really? I can't be charging that? So, I think it cuts both ways, right? No matter how you slice it, the federal court opining on the scope of a state statute is not an ideal situation, but it's one we're stuck with, right? If I could respectfully just disagree with that, I think the realistic probability backstop actually avoids that particular result. So, if the court applies such realistic probability, the court doesn't actually have to get to that particular interpretation. But that's only if we get to that stage of the analysis, and if we determine that there's no ambiguity in the statute, as if plain text is something that we just have to throw up our hands and say, look, you know, God bless the categorical approach, right? I agree the categorical approach sometimes leads to what I would call absurd results. Let me just ask you, I mean, you know, we talk a lot about the categorical approach and these bizarre hair-splitting angels dancing on the head of instinct. One question I've always had is, how much impact should this have, at least when you're dealing with sensing guideline issues? And I know it's different from when you're talking about what can be, say, an active predicate or a 924C predicate, but when you're dealing with these guideline issues, isn't one of the solutions that the district courts can either vary upward or downward, so if they find that something bizarrely applies under the categorical approach, but they think it's a complete outlier, they can downwardly vary and say, well, for some reason this prior offense is qualifying as a categorical approach, but in no sane world should it do so. I'm going to downwardly vary and act as though it doesn't. And conversely, couldn't they say, I have this bizarre outlier of a state statute and plainly include some isomer that there's no evidence anybody was ever prosecuted for. I'm going to upwardly vary because I'm creating what is in effect an unwarranted sentencing disparity. So I guess one of my points is even though we deal with a constant barrage of bizarre applications as the categorical approach, isn't one of the answers well, yes, but we should also recognize that district courts now while post-Booker granted ample discretion to look at all the 3553A factors, they have a certain corrective power to, if they see something that is truly an anomaly, they can correct for it. And if they choose not to correct for it, as long as they recognize their discretion, well then that's a sign that they're the ones who are closest to the ground and are engaged in the individualized sentencing decision and let them sort it out, and we'll review it, and if it's reasonable, it's fine. I don't disagree with that as a general proposition, and certainly there are sentencing where district judges rule on this or other thorny guidelines issues including categorical approach issues, and sometimes judges will make clear that their sentence is not based on the guidelines range that results from that calculation but instead relies on other factors including 3553A factors. And in those cases, in appeals, whether they're brought by defendants or the government, the court could of course affirm on harmless error grounds. But there are also sentencing where judges don't make that clear, and when it's not so clear that the same sentence would be imposed, what we are left with is law that says that the guidelines range imposes a particular anchoring effect on judges, and therefore we have to... Let's talk about the anchoring effect, and obviously we do have to account for that. Maybe this is simply an observation that suggests that both parties would be equally well-served by suggesting to the district court that wherever the guidelines land, if for some reason that guideline calculation is completely out of whack with whatever the district court thinks is satisfying all the 3553A factors, they're free to up or down or vary as long as they explain it, and maybe it would be... Both parties would be well advised to ask the district court that may refuse to answer the question, would your sentence be the same under scenario A or B, whether the guideline technically applies or does not, and perhaps with more detailed... The more detailed possible explanations we get from the district court, the more we are in a position to exercise our review over this. In this particular case, we could predict that the judge would rule against us on this issue because he had ruled in another case on this issue, and so in anticipation of that, we actually asked for an upward departure at sentencing, which was denied, and ultimately, again, the court did not give an indication that it would have imposed the same sentence, and so... Maybe there would be a different result, maybe there would not be a different result, but I understand that absent a statement by the district court, we're left only to guess whether this was harmless or not. Okay. I think we have... Unless there are any further questions, I think we've kept you up considerably past your time, but thank you very much. Why don't we hear from Ms. Holland. It's been a while. Still here, Your Honor. I'm just going to very briefly touch on the cocaine isomer issue, and as Judge Pettis has noted, and I think you were on a panel last week with another one of these cases, it's pending in a lot of cases before this court. I think that Minter might control it. I think that is my understanding, which I think was argued back earlier this year, might control this case. So that's, in your view, ahead of... I think so. Yeah, I think that's about right. What is the name? Minter, M-I-N-T-E-R. I think the parties have noted it in their brief. I think I saw that name. Yeah. But, you know, it's our contention that this statute is, you know, plain on its face, and it's not ambiguous, and thus, you know, and thus the reasonable probability test may not be employed. Just moving back to the Second Amendment issue very, very briefly, I would urge the court, Judge Rooney, I appreciate that you brought up the non-ferritum, you know, approach to plain error review, because I would ask the court to reach this area, you know, and really grapple with it. It sounds like the panel is trying hard to really think through that, and we appreciate that. What if, hypothetically, we were to rule against you? I'd say go right back and call it not plain. We've only ruled on the second prompt. That's right. Go right there, Your Honor. How did you know? But, you know, if the court were to rule in our favor, we would say, you know, we'd remind the court that, you know, this court can find plain error even in light of settled principles, even if there is not case law, and we'd say that Bruin settles it here. I also would just, Judge Nardini, in terms of your questions about Mr. Simmons' prior felony, you know, this is sort of new to the parties, and so I was thinking about it as I was sitting here. I'd ask the court not to decide on this ground, because the government was not urging it, you know, until we're here. You know, in the criminal culpability in this case, and the reason that we're really pressing our claim before the court is this misdemeanor, and that's what the court is doing. If the court is inclined, not that I want more briefing in this case, but if the court really is taking this seriously, I'd ask that the court would order additional briefing so that we can really explore our position. And then, I just... We'll let you know if we need that, but thank you, and your point is well taken. Yeah, and you know, I think the one thing I really want to get at is, you know, we've been talking about the level of generality and how specific, how deep do we drill down, how high up do we go. You know, I think there's a big concern with using a general dangerousness or appearance of dangerousness lens here, and I think the problem with that is, Judge Perez, as you were bringing up, social mores and views and, you know, congressional findings and, you know, issues of the day change year to year, you know. At one point, Quakers were the ones, you know, were the disfavored religion and were therefore not considered dangerous, you know, and they were not to the political order. They weren't permitted to have guns, and so, you know, while I can understand that, you know, we're talking about, you know, a crime that had violence in it. We're talking about a misdemeanor that has violence in it, so it seems easier to grapple with this particular case, but if we choose dangerousness as the lens, you know, this court is going to be confronted with a lot of questions about what's dangerous and what's not. I mean, drunk drivers are dangerous too, and, you know, as much as everyone abhors drunk drivers, I don't know that that would, you know, that, you know, disarmament is justified, right? Unless they're driving with a gun. That's right, Your Honor. Unless there's a connection between them. Right, right. So, you know, so I think that's a real issue with this, and, you know, I know that the court is taking this very seriously, and we really appreciate it. Well, thank you very much to both of you. We've certainly got our money's worth from both counsel, very well argued on both sides who take the case under advisement, so thank you all very much.